UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                          Civil Action No. 2:23-cr-00128

BRIAN LEE CORBETT


MEMORANDUM OPINION AND ORDER


Pending is defendant's Motion to Suppress Evidence, filed on November 9, 2023.  ECF No. 21.  An evidentiary hearing was held on December 5, 2023, see ECF No. 32, the transcript for which was completed and filed on December 14, 2023, see ECF No. 35.  The issue was then fully briefed, with the defendant's supplemental brief in favor of his motion filed on December 29, 2023, see ECF No. 41; the government's supplemental response filed on January 10, 2024, see ECF No. 44; and the defendant's supplemental reply filed on January 16, 2024, see ECF No. 45.

The court makes the following findings of fact by a preponderance of the evidence and the conclusions of law stated below.

I.    Background

At the time of the events leading to defendant's arrest, West Virginia State Police Trooper Tyler J. Hannon ("Trooper Hannon") was assigned to the Bureau of Criminal Investigations Unit and to the "U.S. 119 Task Force" to "investigate drug crimes and violent crimes."  Hannon Suppression Hearing Testimony 4:20-5:4, ECF No. 35 (hereinafter, "Hannon Test.").  Beginning in February 2023, a cooperating individual ("CI") provided information to Trooper Hannon that defendant was distributing controlled substances in Boone and Logan Counties of West Virginia, and that defendant typically travelled thereto from Charleston on the weekends.  Hannon Test. 6:2-18.[1]

Over the next two months, the CI informed Trooper Hannon that defendant was present at "known drug locations." Id.  "[A]t least two separate times," Trooper Hannon conducted surveillance and observed defendant in his vehicle, a gray Lincoln MKZ sedan with license plate 36W500, at two apartment complexes in the Logan Area suspected by the U.S. 119 Task Force to be drug distribution locations.  Hannon Test. 6:19-8:4;

_____

[1] All testimony citations herein refer to the suppression hearing testimony, are contained in ECF No. 35, will be cited in the same manner.

2

Trooper Hannon's Report of Criminal Investigation, Suppression Hearing Defendant's Ex. 1, ECF No. 48-4.  Trooper Hannon's testimony is unclear regarding how quickly those observations occurred after any such tip from the CI.  Trooper Hannon provided no information as to the basis of the CI's knowledge of defendant's travel patterns or drug dealing, except for the singular example of the CI's coworker being involved in a drug deal described below that took place four days before defendant's arrest.

On April 19, 2023, the CI informed Trooper Hannon that the CI's coworker had purchased what the CI suspected to be suboxone from the defendant on April 18, 2023, and that defendant had stored those substances in a camouflage bag in the trunk of his vehicle.  Hannon Test. 9:5-18.  The CI informed Trooper Hannon that the transaction occurred "at the Taco Bell in [Southridge Shopping Center]" in South Charleston, Kanawha County, West Virginia.  Hannon Test. 8:14-16.

On Saturday, April 22, 2023, Trooper Hannon was informed by the CI that defendant had informed the CI that he would be "down in Logan County around [2:00 p.m.]" that day. Hannon Test. 10:12-13.  There is no indication that the purpose of defendant's trip to Logan County on April 22, 2023, was to transact controlled substances.  Upon learning of defendant's

travel plans, Trooper Hannon "advised the cooperating individual to order 3.5 grams of cocaine from [defendant]."  Hannon Test. 10:4-7.  When asked when the defendant was "supposed to bring those drugs to the [CI]," Trooper Hannon could not give a direct, affirmative response that defendant would bring the 3.5 grams of cocaine to Logan County that day.  Id. at 10:10-13.

Believing that defendant would be travelling south on U.S. Route 119 during the afternoon of April 22, 2023, based on the information from the CI, Trooper Hannon positioned himself along U.S. Route 119 near Charleston where it runs toward Logan County to watch for defendant's vehicle.  See Hannon Test. 9:23-11:6.

Trooper Hannon informed fellow West Virginia State Troopers Allen R. Workman ("Trooper Workman") and T.D. Fields ("Trooper Fields") of the CI's tip and instructed them to attempt a traffic stop of defendant's vehicle.  Hannon Test. 9:23-11:6.  Trooper Hannon enlisted the help of Trooper Workman because he had a narcotic-detecting dog.  Hannon Test. 12:4-5. In turn, Trooper Workman enlisted the help of West Virginia State Police Sergeant Jamie L. Barker ("Sgt. Barker").  See Hannon Test. 11:12-12:9.

Around 4:00 pm that day, Trooper Hannon observed defendant's Lincoln traveling south on U.S. 119 toward Logan

4

County, and Trooper Workman, stationed further south, observed the same car traveling 72-miles-per-hour in a 65-mile-per-hour zone and a window tint that appeared darker than the legal limit. See Workman Test. 48:19-53:18. Workman then confirmed defendant's excessive speed with his radar. Workman Test. 48:19-53:18. Relying only upon those two observed alleged traffic violations, Trooper Workman, at 4:08 p.m., initiated a traffic stop of defendant's vehicle. Joint Stipulation ¶ 1, ECF No. 38 (hereinafter "Jt. Stip.").[2] The events that transpired during the traffic stop are as follows.

At 16:08:28,[3] Trooper Workman contacted dispatch and requested to run the license plate on defendant's vehicle. Jt. Stip. ¶ 1. At 16:08:50, dispatch responded that the vehicle was registered to the defendant. Id. At 16:08:56, Trooper Workman informed dispatch that he was initiating a traffic stop of the vehicle. Id.

At 16:09:00, Trooper Workman pulled his cruiser to the right shoulder of the road and parked behind Mr. Corbett's vehicle. Id. at ¶ 2. At 16:09:30, Trooper Workman made initial

_____

[2] The parties filed a Joint Stipulation, stipulating to the sequence of events during the traffic stop for the purposes of this motion. Jt. Stip., ECF No. 38.
[3] Hereinafter, the timestamps will use 24-hour format to align directly with the officers' body camera footage for ease of reference.

contact with Mr. Corbett.  Id.  At 16:09:34, Mr. Corbett handed Trooper Workman his insurance and registration information and his driver's license.  Id.  Between 16:09:40 and 16:09:48, Trooper Workman said that he had pulled Mr. Corbett over for speeding and window tint that appeared too dark.  Id.  At 16:10:13, Trooper Workman asked the passenger in defendant's vehicle for identification.  Id.  At 16:10:28, Trooper Workman asked defendant if there was anyone in the backseat because "I can't see with that window tint," and defendant rolled down the rear windows.[4]  Id.; Workman Test. 91:21-25 ("I asked him to roll his back windows down, which he did. And I told him he could roll them back up, and he left them down."); Workman Bodycam at 16:10:28, ECF No. 21-1.  At 16:10:36, defendant handed his passenger's driver's license to Trooper Workman.  Id.  At 16:10:41, Trooper Workman asked if there were any weapons in the vehicle. At 16:10:47, Trooper Workman told defendant and his passenger to wait while he ran their information.  Id.

---

[4] The parties only stipulate that defendant "rolled down the window," indicated defendant only rolled down an unspecified singular rear window. Jt. Stip. ¶ 2.  However, Workman's bodycam demonstrates he asked if there was anybody in the backseat and, a couple moments later, said, "you can roll them back up if you want."  Workman Bodycam at 16:10:35.  Workman also testified that defendant rolled down multiple rear windows, rather than a single window.  The court accordingly finds that defendant rolled down both rear windows and, on his own volition, chose to leave them down.

At 16:10:52, Trooper Workman asked Sgt. Barker to run defendant's and his passenger's information and handed him the registration and insurance documents and the driver's licenses. Id. at ¶ 3.  At 16:10:59, Trooper Workman informed defendant and his passenger that Sgt. Barker was going to run the information. Id.  Between 16:11:03 and 16:11:45, Trooper Workman spoke with defendant about where defendant and his passenger were going that afternoon.  Id.  At 16:11:45, Trooper Workman walked away from defendant's vehicle and toward Trooper Fields, who was waiting beside Trooper Workman's cruiser.  Id.

Trooper Barker testified that, upon receiving the documents, he "walked back to [his] vehicle and got straight in [] and requested [the driver's history from dispatch]," and that he did nothing to delay his inquiry.  Barker Test. 106:1-10. Dispatch responded "a couple [of] minutes later."  Id. at 106:18.

Between 16:11:52 and 16:12:03, Trooper Workman spoke with Trooper Fields and said, among other comments,[5] that he was

---

[5] Defendant alleges that Trooper Workman said, "I'm getting ready to f**k 'em," but the government alleges that Trooper Workman said, "I'm getting ready to pluck 'em," referring to removing the occupants of defendant's vehicle from the car.  See Def. Mot. at 2; Workman Test. 79:17-22.  The bodycam is not clear, and the court need not decide.  If Trooper Workman said "pluck," it was because it was "policy that, when we do a K-9 sweep of the vehicle, that [occupants] are to be removed."  Workman Test. 79:24.

going to ask Mr. Corbett for consent to search the vehicle and perform a dog sniff.  Jt. Stip. ¶ 5.  At 16:12:12, as he returned to Mr. Corbett's vehicle, Trooper Workman asked Mr. Corbett if his license was suspended.  Id.  At 16:12:16, Trooper Workman asked Mr. Corbett to exit the vehicle.  Between 16:12:29 and 16:12:48, Trooper Workman performed a pat-down of Mr. Corbett.  Id.  At 16:12:55, Trooper Workman asked Trooper Fields to perform a pat-down of the passenger.  Id.

At 16:13:00, Trooper Workman asked Mr. Corbett if there was "anything illegal" in his vehicle, and if he would be willing to consent to a search.  Id. at ¶ 7.  At 16:13:09, Mr. Corbett declined to give his consent.  Id.  At 16:13:15, Trooper Workman directed Mr. Corbett to walk to the front of the vehicle, where Trooper Fields and Mr. Corbett's passenger were standing.  Id.

At 16:13:19, Trooper Workman turned and walked back toward his cruiser to retrieve his police dog, Kali ("K9 Kali"). Id. ¶ 8.  Trooper Workman testified that K9 Kali had received training from the West Virginia State Police, that he and K9 Kali had undergone a month-long training period together, that he and Kali were twice certified at the time of the stop, and that he and Kali did ad hoc, continuous training on a regular basis.  See Workman Test. 34-42:7.  As part of that training, K9

8

Kali has learned to jump up onto a vehicle, a practice referred to as "upping" in response to his handler "detail[ing] him in an upward motion to get those seams up higher." Id. at 73:19-74:1. K9 Kali has learned, through repeated practice, to "up" even without a prompt to do so. Id. at 74:9-17. In fact, Workman testified that detailing[6] K9 Kali is "not something [he] even [has] to do" to prompt an "up" because "[he and K9 Kali] have done enough training now that he kind of does it instinctively." Id.

Returning to the sequence during the traffic stop, between 16:13:35 and 16:13:39, Sgt. Barker leaned out of his car, spoke to Trooper Workman, and made a hand motion directed at Trooper Workman. Jt. Stip. ¶ 7. At 16:13:44, Trooper Workman opened the rear passenger door of his cruiser to get K9 Kali out. Id. At 16:13:59, K9 Kali jumped out of the cruiser. Between 16:14:00 and 16:14:07, Trooper Workman led K9 Kali from his cruiser to the rear of defendant's vehicle. Id.

At 16:14:09, K9 Kali stood at the rear passenger's side of Mr. Corbett's vehicle, near the trunk. Id. at ¶ 8. At

---

[6] Though never defined as used in this context, it appears that Workman uses "detailing" to mean "commanded" either verbally or by gesture. See Workman Test. 84:15-20 ("I mean, it's apparent with my hands, when I do like a larger truck or something like that, I detail him up with my hands like this (indicating)").

16:14:13, Kali jumped up on her hind legs with her front paws on the rear passenger side of defendant's vehicle. Id. Between 16:14:13 and 16:14:16, K9 Kali sniffed around the rear passenger's side door, with his paws on the "windowsill" of the rear passenger side door and his head inside the vehicle at the open window. Id. Between 16:14:16 and 16:14:20, Trooper Workman led K9 Kali along the passenger's side and around the front of Mr. Corbett's vehicle to the front driver's door. Id. Between 16:14:22 and 16:14:42, K9 Kali stood on his hind legs at the front driver's door of Mr. Corbett's vehicle, with his front paws resting on the "windowsill" of the door and his head inside the vehicle at the open window. Id. At 16:14:43, K9 Kali assumed a seated position on the ground at that same location. Id. This seated position – and only this seated position – is K9 Kali's "alert" sign that he has detected a narcotic that he is trained to find. Workman Test. 43:15-19 ("The alert would be the sit that he goes into."); 99:19-25 (responding to whether there is no alert until K9 Kali sits, Workman testified "[t]hat would be the – the (sic) alert we train."). This "alert" occurred less than four minutes after Trooper Workman received the papers from defendant and his passenger. Sgt. Barker reported back to Trooper Workman that the defendant's license was valid (though the passenger's license was suspended) at 16:15:05, about four and a quarter minutes after receiving the

papers and twenty seconds after K9 Kali alerted at the front
driver's door.  Jt. Stip. ¶ 10.

Trooper Workman testified that he has noticed that K9
Kali often indicates other signs of an imminent alert, "body
changes" including "behavior changes, breathing, tense in his
body, just basic mannerisms, in general, will change when he
comes into the odor of narcotics," pursuant to which Workman
believed he can "tell when [K9 Kali] comes into the odor of
narcotics . . . before he goes into that seated position."
Workman Test. at 43:15-24.  Trooper Workman further testified,

> [K9 Kali] initially upped near the rear
> passenger side seat, which (sic) I observed
> somewhat of a body change, like somewhat of
> a breathing change around there, a small
> one.  I kind of pulled him out of it and
> worked him around, and he really locked in.
> And he displayed that real quick breathing
> change at the driver's side door. And that's
> when he really locked in. I couldn't even
> pull him out of the odor at that point. He
> was locked in firm. And then he went into
> that sit.

Id. at 60:1-10.

At 16:14:44, Trooper Workman verbally praised K9 Kali
and began to walk K9 Kali back to his cruiser.  Jt. Stip. ¶ 8.
At 16:14:53, K9 Kali jumped back inside Trooper Workman's

11

cruiser.  Id. at ¶ 10.[7]  At 16:15:03, Sgt. Barker approached
Trooper Workman, who was standing beside his cruiser.  Id.
Between 16:15:05 and 16:15:11, Sgt. Barker spoke to Trooper
Workman about the status of defendant's and his passenger's
driver's licenses.  Id.  Between 16:15:14 and 16:15:18, Trooper
Workman told Sgt. Barker that K9 Kali had "indicated" on
defendant's vehicle.  Id.

     At 16:15:54, Trooper Workman opened the front
passenger's side door of defendant's vehicle and began searching
the vehicle.  Id. at ¶ 11.  While searching the trunk, Trooper
Workman reached for a camouflage bag.  Id.  Trooper Workman
found within the camouflage bag small plastic baggies of
suspected controlled substances in an unlocked zipped
compartment on the top of the bag.  Id.  Trooper Fields then
approached Trooper Workman and told him that defendant had said
that there was marijuana and a set of scales in a pink bag in
the trunk of the vehicle.  Id.  Trooper Workman proceeded to cut
open the zipper to the locked main compartment of the camouflage
bag, and he saw suspected controlled substances inside.  Id.
Trooper Workman then found the pink bag containing the marijuana
and the scales inside a backpack in the trunk.  Id.  Trooper

_____

[7] The Joint Stipulation went from ¶ 8 to ¶ 10, omitting ¶ 9.  For ease of
reference, this order uses the numbering in the joint stipulation.

Workman placed the pink bag and the camouflage bag back inside the trunk of defendant's vehicle, and then closed the trunk. Id.

Trooper Workman next leaned inside the front passenger's side door of defendant's vehicle and picked up some cash that Trooper Fields had placed on the seat. Id. at ¶ 12. Sgt. Barker asked Trooper Workman if he wanted to put the cash in an evidence bag. Id. Trooper Workman handed the cash to Sgt. Barker and closed the front passenger's side door of defendant's vehicle. Id. Trooper Workman then placed a purse belonging to defendant's passenger on the hood of defendant's vehicle and began to look through it. Id. Trooper Workman found two Suboxone strips inside the purse and placed them on the hood of his cruiser. Id. Trooper Workman asked Mr. Corbett and his passenger if the camouflage bag belonged to them. Id. at ¶ 13. At 16:24:33, Trooper Workman informed Mr. Corbett and his passenger that they were under arrest. Id.

Trooper Workman then opened the rear driver's side door of his cruiser to again get K9 Kali and directed him to exit the cruiser. Id. at ¶ 14. After leading K9 Kali to the rear of defendant's vehicle, Trooper Workman gave K9 Kali the command to begin a dog sniff. Id. K9 Kali raised up on his hind legs and placed his front paws on the area between the

trunk and the rear passenger's side door of defendant's vehicle. Id. K9 Kali then assumed a seated position on the ground near the trunk of defendant's vehicle, and Trooper Workman tossed the ball at him. Id. Trooper Workman then opened the rear passenger's side door of his cruiser and directed K9 Kali to get inside. Id. Trooper Workman commented that K9 Kali was "back to normal after getting his brains knocked out." Id.

## II.   Procedural History

On August 8, 2023, a grand jury returned an indictment charging defendant with one count of possession with intent to distribute 40 grams or more of fentanyl, cocaine, and "crack" cocaine, in violation of 21 U.S.C. § 841(a)(1). See ECF No. 1. Defendant was arraigned on August 16, 2023. ECF No. 10.

Defendant's Motion to Suppress Evidence alleges that the evidence must be suppressed on three independent grounds: first, that the officers did not have probable cause to effectuate the traffic stop; second, that the officers exceeded the appropriate scope and duration of the traffic stop in violation of Rodriguez v. United States, 575 U.S. 348 (2015); and third, that K9 Kali is unreliable and the officers unreasonably searched defendant's vehicle when K9 Kali "upped" onto the rear passenger windowsill, inserted his head into the open rear passenger window, and did the same at the driver side

14

front window.  See Def. Mot., ECF No. 21.  The government

responded in opposition on all grounds.  Govt. Resp., ECF No.

27.

### III. Discussion

#### a.   Traffic Stop

The Fourth Amendment commands that "[t]he right of the

people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not

be violated."  U.S. Const. amend. IV.  A traffic stop is a

seizure of a car's driver within the meaning and purview of the

Fourth Amendment and "is thus subject to a reasonableness

requirement."  United States v. Perez, 30 F.4th 369, 374 (4th

Cir. 2022); see Delaware v. Prouse, 440 U.S. 648, 653 (1979).

Reasonableness "is measured in objective terms by examining the

totality of the circumstances," Ohio v. Robinette, 519 U.S. 33,

39 (1996), and, under Terry v. Ohio, a traffic stop "is

reasonable if (1) the stop is legitimate at its inception and

(2) the officer's actions during the stop are reasonably related

in scope to the basis of the stop."  Perez 30 F.4th at 375

(citing Terry v. Ohio, 392 U.S. 1, 20 (1968)); United States v.

Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (holding the court

must inquire "whether the officer's action was justified at its

inception and whether it was reasonably related in scope to the

circumstances which justified the interference in the first place.").

Defendant argues that the traffic stop at issue in this matter violated the Fourth Amendment by violating both Terry prongs such that the there was no probable cause to effectuate the stop at its inception and that the officers exceeded the appropriate scope of the stop through actions that were not reasonably related to its basis.

### i. Probable Cause for Traffic Stop

As to the first Terry factor, a traffic stop is legitimate at its inception when "the officer [has] probable cause to believe a traffic violation has occurred." United States v. Miller, 54 F.4th 219, 228 (4th Cir. 2022). That is, the officer must have "a particularized and objective basis for suspecting the particular person stopped of" committing a traffic violation or other criminal activity. Kansas v. Glover, 589 U.S. ___, 140 S. Ct. 1183, 1187 (2020). When an officer observes a vehicle he believes to be speeding, radar confirmation of a vehicle's excessive speed constitutes probable cause to believe the vehicle is speeding. United States v. Sowards, 690 F.3d 583, 592 (4th Cir. 2012) (collecting cases upholding the proposition that radar supports "reasonableness of an officer's visual estimate that a vehicle is traveling in

slight excess of the legal speed limit."). Further, "[b]ecause
'[o]bserving a traffic violation provides sufficient
justification for a police officer to detain the offending
vehicle for as long as it takes to perform the traditional
incidents of a routine traffic stop,'" an officer's observation
that a vehicle's window appears to violate state law is
"alone . . . sufficient to justify [a] stop." United States v.
Green, 740 F.3d 275, 279 n.1 (4th Cir. 2014) (quoting United
States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008)).

        As to the speed limit, Trooper Workman testified that,
while he was positioned facing southbound traffic watching for
defendant's vehicle "on [U.S. Route] 119 . . ., just north of
the [West Virginia Route] 214 intersection," the defendant's
vehicle "was speeding when [he] saw it," as confirmed by a radar
reading "that [the defendant] was traveling 72 miles an hour in
a posted 65-mile-per-hour zone,"[8] in violation of state law.
Workman Test. 47:8-49:8, ECF No. 35; see W. Va. Code § 17C-6-1
(establishing that violation of a duly established speed limit
is a violation of state law). Accordingly, because Trooper
Workman determined, using radar, that defendant's vehicle was

_____

[8] The court notes that, though defendant has not challenged the accuracy of
the radar, Trooper Workman further testified to the calibration and
reliability of the radar used to determine that the defendant was driving at
an excessive speed. Id. at 50:3-51:17.

traveling above the speed limit, he had "an objectively reasonable basis for probable cause" that a traffic violation had occurred, and thus had probable cause to initiate a traffic stop.  Sowards, 690 F.3d at 594.

Troopers Workman and Hannon testified that the traffic stop was effectuated not only because of the defendant's speed but also because he suspected that the defendant's window tint was illegal.  Hannon Test. 22:9-14; see also Workman Test. 48:22-24, 51:20-53:18.  Trooper Workman testified that he observed defendant's car to have an illegal window tint based on the fact that he could not see the silhouette of a person inside the vehicle, which he testified is only possible when a car's window tint exceeds the legal limit in West Virginia.  See Workman Test. 52:12-53:6.

Because probable cause to stop defendant's vehicle existed based on the officer's observation and radar confirmation of excessive speed, the court need not reach the question of whether the officer's observation of an illegal window tint provides probable cause to effectuate a traffic stop.

Accordingly, the court finds that the first Terry prong is satisfied, and that the officers effectuating the

traffic stop had a legitimate basis for probable cause that the defendant had committed a traffic violation.

### ii. Scope of the Stop

Turning to the events that transpired after the defendant's vehicle had been stopped, the court considers whether the officers took actions that were reasonably related in scope to the basis of the stop.  See Robinette, 519 U.S. at 39; Terry, 392 U.S. at 20.

Defendant argues that officers exceeded the appropriate scope and duration of the traffic stop by allegedly abandoning its mission to issue citations for illegal speed and tint and embarking on an "unfounded drug investigation."  Def. Mot. Br. 4, ECF No. 21.  Defendant argues this transgression occurred when, he contends, Trooper Barker "ensured that [K9 Kali] alerted before [Trooper Barker] announced that the normal incidents of the traffic stop were complete," and thereby ran afoul of Rodriguez v. United States, 575 U.S. 348 (2015).  Def. Mot. Br. 4.  The government contends that the dog sniff did not unreasonably extend the duration of the traffic stop.  Govt. Resp. Br. 10-14.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'" and the stop "may 'last no longer than is necessary to

effectuate th[at] purpose'." Rodriguez, 575 U.S. at 354 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005); Florida v. Royer, 460 U.S. 491, 500 (1983)(plurality opinion)). "If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). That determination includes "ordinary inquiries incident to the traffic stop," which "[t]ypically . . . involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355 (citing Illinois v. Caballes, 543 U.S. 405, 408 (2005)); see also United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) ("[P]ursuant to a [routine traffic stop], a police officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." (internal citations omitted)). "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Branch, 537 F.3d at 336; Rodriguez, 575 U.S. at 350 (rejecting a de minimus extension of time of a traffic stop to conduct a dog sniff).

"An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009). "One such inquiry is a dog sniff," which is permissible if it occurs before "'the tasks tied to the traffic infraction we[re] — or reasonably should have been — completed.'" <u>United States v. Perez</u>, 30 F.4th 369, 375 (4th Cir. 2022) (quoting <u>Rodriguez</u>, 575 U.S. at 354–55).

Trooper Workman initiated the traffic stop of defendant at 16:08:28 and pulled his cruiser behind defendant's vehicle on the shoulder of the road at 16:09:00.  Joint Stip. ¶ 2.  At 16:10:52, Trooper Workman asked Sgt. Barker to "run [d]efendant's and his passenger's information and handed him the registration and insurance documents and driver's licenses." <u>Id.</u> at ¶ 3.

Between 16:11:03 and 16:13:19, Trooper Workman asked defendant for consent to search his vehicle (which was denied), asked defendant about his travel plans, asked about the status of his license, asked him to exit the vehicle, asked him about the presence of contraband in the vehicle, patted defendant down, and had defendant move to the front of the vehicle next to

Trooper Fields.  Id. at ¶ 3-6.  At 16:13:19, Trooper Workman went to his cruiser to retrieve K9 Kali.  By 16:14:43, K9 Kali alerted to the presence of contraband by assuming a seated position on the ground next to the driver's door, being five minutes and forty-three seconds after Trooper Workman pulled up behind defendant in his vehicle.  Trooper Workman returned K9 Kali to his cruiser at 16:14:53, and, between 16:15:05 and 16:15:11, Sgt. Barker "spoke to Trooper Workman about the status of [d]efendant's and his passenger's driver's licenses."  Id. at ¶ 10.

There is no indication, nor does defendant argue, that Sgt. Barker delayed his investigation — in fact, Sgt. Barker testified that after Trooper Workman handed him the documents, he "walked backed back to [his] vehicle and got straight in [his vehicle] and requested [the driver's history from dispatch]" and did nothing to delay his inquiry.  Barker Test. 106:1-10, ECF No. 35.  It took dispatch "a couple minutes" to reply to his inquiry, and "[b]y the time [he] got the responses back from the dispatcher, Trooper Workman had already finished with the dog."  Id. at 106:18, 107:22-24.

The dog sniff occurred while Sgt. Barker was executing a search of the driver's history, which is a task that is an "ordinary inquiry incident to a traffic stop."  Rodriguez, 575

U.S. at 355.  Accordingly, the court finds that the dog sniff did not "measurably extend the duration of the stop," Johnson, 555 U.S. at 333, and that it occurred before "the tasks tied to the traffic infraction were — or reasonably should have been — completed," Perez, 30 F.4th at 375.

In brief conclusion, because the traffic stop was legitimate at its inception and the officers' action during the stop were reasonably related in scope to the basis of the stop and did not extend its duration, the traffic stop was a reasonable seizure of defendant and his vehicle, permitted by the Fourth Amendment.[9]

b.   Level of Suspicion Based Upon Cooperating Individual's Information

If probable cause to search defendant's car existed prior to K9 Kali's sniff, defendant's arguments in favor of suppression due to an impermissible search would fail.  The court first considers what level of suspicion objectively arises

---

[9] The government again argues, based on its allegedly reliable informant's tip, that the officers had reasonable suspicion to effectuate a drug interdiction stop and that, in that context, a dog sniff is a "permissible technique to identify narcotics."  Govt. Resp. Br. 13-14 (quoting Perez, 30 F.4th at 375).  The court need not delve into this argument because it has already found the traffic stop and the timing of the dog sniff constitutional.

solely due to the information provided by the CI prior to the
dog's sniff.

### i. Probable Cause Based on CI

An unidentified informant's tip is "rarely adequate on
its own to support a finding of probable cause." United States
v. Miller, 925 F.2d 695, 698 (1991).  To determine whether an
officer acting on an unidentified informant's tip has probable
cause, the court must "look to the totality of the circumstances
surrounding the information available to the officer."  Id.
(citing Illinois v. Gates, 462 U.S. 213, 237 (1983)).  In such
an analysis, courts consider a variety of factors, including but
not limited to whether the "informant's interest in obtaining
leniency created a strong motive to supply accurate
information," id. at 699; "an officer's practical experience and
the inferences the officer may draw from that experience,"
United States v. McLean, 581 Fed. App'x 228, 232 (4th Cir. 2014)
(citing Ornelas v. United States, 517 U.S. 690, 700 (1996)); and
"the facts within the knowledge of arresting officers," Smith v.
Munday, 848 F.3d 248, 253 (2017).  Further, an informant's
"'veracity' or 'reliability' and his 'basis of knowledge' are
relevant considerations in the totality-of-the-circumstances
analysis," but it is said that neither consideration is
necessary.  United States v. Gondres-Medrano, 3 F.4th 708, 715

(4th Cir. 2021).  Additionally, police officers who have
legitimately stopped an automobile and who have probable cause
to believe that contraband was concealed somewhere within it may
conduct warrantless search of the vehicle "as thorough as a
magistrate could authorize in a warrant."  United States v.
Ross, 456 U.S. 798, 824 (1982).

For example, in Alabama v. White, 496 U.S. 325, 329
(1990), an anonymous call reported that White would be leaving a
particular apartment at a particular time in a brown Plymouth
station wagon with a broken right taillight to go to a
particular motel, and that she would have a brown case with an
ounce of cocaine therein.  496 U.S. at 327.  At the indicated
time, police saw an empty-handed woman leave the indicated
apartment and get in the described vehicle.  Id.  After she
began driving to the indicated motel, police stopped the car and
found marijuana in a case inside.  Id.  "Relying upon the
corroboration of the tip's predictive aspects," the Court in
White found "good reason to believe the caller was honest, well
informed, and reliable," and that the officers had probable
cause to seize White by pulling her over.  Gondres-Medrano, 3
F.4th at 716 (citing White, 496 U.S. at 332).

The court thus turns to whether the cooperating
individual's tip in this matter was sufficient to establish an

independent basis for probable cause for the officers to
warrantlessly search a defendant's vehicle.  First, the court
notes that there appears to be no basis for the information that
the CI had previously provided Hannon.  Trooper Hannon does not
testify as to the identity of the CI, to how the CI knows
defendant or his whereabouts, nor to any interest that the CI
has in providing accurate information.  See Miller, 925 F.2d at
699.  Additionally, though Trooper Hannon has corroborated the
CI's previous information regarding defendant's whereabouts at
locations suspected by Trooper Hannon and the 119 Task Force to
be apartment complexes related to drug activity, Trooper Hannon
has not indicated any instance where he had corroborated
defendant's drug dealings by, for example, obtaining any
evidence from the CI that previous drug transactions have, in
fact, occurred.  In the same vein, Trooper Hannon has not
indicated any other basis of the CI's credibility — there
appears to be no history of the CI providing reliable,
inculpating information in this or other cases.

        Further still, though Trooper Hannon knew that
defendant had told the CI that the defendant would be traveling
to Logan County on April 22, that defendant had previously
transported drugs in a camouflage bag, and that he had
instructed his CI to order 3.5 grams of cocaine powder from

defendant, Trooper Hannon could not confirm that defendant was supposed to bring the cocaine to the CI on April 22.  Trooper Hannon could only confirm that he was aware of defendant's travel plans.[10]  In short, Trooper Hannon has provided no evidence that the CI ordered the cocaine as instructed or that Trooper Hannon had evidence that defendant would be carrying drugs on April 22, 2023.

To be sure, the foregoing indications provide some basis to believe that defendant was engaged in criminal behavior while driving down to Logan County on April 22, 2023.  Trooper Hannon had been able to previously confirm the CI's tips that defendant was present at two apartment complexes in Logan County, approximately some sixty miles from defendant's home in Charleston, and which locations were said to be suspected by the 119 Task Force as being drug distribution residences.  At those locations, Hannon saw defendant in his vehicle.  Additionally, Hannon had been tipped that the defendant was traveling to Logan

---

[10] The following colloquy occurred at the suppression hearing:
"Q: When Did you direct the cooperating individual to do anything in response to that tip?
A: Yes, ma'am. I advised the cooperating individual to order 3.5 grams of cocaine from Mr. Corbett.
. . .
Q: When was the defendant supposed to bring those drugs to the cooperating individual?
A: The CI advised Mr. Corbett advised him he would be down in Logan County around 2 p.m. on Saturday, the 22nd." Hannon Test. 10:4-13.

County on a particular day and at a particular time.  And, impliedly, it appears Hannon understood that information to mean that defendant would be in possession of contraband.

Nonetheless, the court finds that totality of the circumstances fail to establish that the CI's information, alone, establishes probable cause to search defendant's vehicle. The court is swayed by the lack of any history of the CI providing corroborated, accurate information about the defendant's drug dealing; the lack of specific indication or confirmation from Hannon that defendant would be transporting drugs on April 22, 2023, to consummate a sale; the lack of apparent motivation by the CI to provide accurate information; and the lack of prior corroboration by Trooper Hannon of drug-related information provided by the CI.  Unlike cases where the tip provides significant detail as to the suspect's position, course, or behavior, all that Trooper Hannon could here testify to is that the CI told him that defendant would be traveling down to Logan County at around 2:00 p.m. on April 22, 2023.

Thus, the CI's tip alone is insufficient to establish probable cause that the defendant was engaged in criminal activity when he was seen driving toward Logan County on April 22, 2023.

ii. Reasonable Suspicion Based on CI

Even where an informant's tip is insufficient to establish probable cause, it may be sufficient to satisfy the lesser standard of reasonable suspicion that "criminal activity 'may be afoot.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); Adams v. Williams, 407 U.S. 143, 146-47 (1972) (finding an informant's tip provided reasonable suspicion but not probable cause). Reasonable suspicion exists where an officer has and can specifically articulate "a particularized and objective basis" for suspecting criminal activity. United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). Whether reasonable suspicion of criminal activity exists depends on the totality of the circumstances, "including the information known to the officer and any reasonable inferences to be drawn at the time of the stop." United States v. Hands, 573 F. App'x 278, 279 (4th Cir. 2014) (citing Arvizu, 534 U.S. at 273-74). This determination is a "commonsensical proposition," and "deference should be accorded to police officers' determinations based on their practical experience and training." Id. (citing United States v. Foreman, 369 F.3d 776, 782 (4th Cir. 2004).

For example, in Adams v. Williams, an officer was alone in his patrol car when "a person known to [him] approached his cruiser and informed him that an individual seated in a

nearby vehicle was carrying narcotics and had a gun at his waist." 407 U.S. at 144-45. The officer did nothing to corroborate the tip before tapping on the indicated car's window, at which time the individual therein lowered it, and the officer "reached into the car and removed a fully loaded revolver from [the individual's] waistband," executing what the Supreme Court identified as a "limited protective search for concealed weapons" that was justified under Terry. Id. at 145-46. The defendant there had challenged the Terry frisk, arguing that the officer lacked reasonable suspicion that he was engaged in criminal activity. The Supreme Court held that, though the "informant's unverified tip may have been insufficient" to establish probable cause, "the information carried enough indicia of reliability to" establish reasonable suspicion and thus "justify the officer's forcible stop of" the individual. Id. at 146-47. The Court so held because the "informant was known to [the officer] personally and had provided him with information in the past," the tip weighed against the informant's immediate penal interests, and the informant personally provided immediately verifiable information. Id.

In this case, the court finds that though Trooper Hannon's CI's information was insufficient to establish probable cause, it may have been sufficient to establish reasonable

suspicion that the defendant was engaged in criminal activity. As discussed above, the CI had at least twice provided information as to defendant's presence at locations suspected by Trooper Hannon to be sites of drug activity and the CI's information that defendant was travelling toward Logan County the day of his arrest was corroborated.  Taken together, these pieces of information are such that a reasonable officer could establish reasonable suspicion that the CI, traveling toward Logan County around the indicated time, was engaged in criminal activity.

Indeed, at the suppression hearing, Troopers Hannon and Workman believed that they had reasonable suspicion that defendant was engaged in criminal activity based solely on the CI's information and the fact that defendant was traveling toward Logan County at the indicated time.  Trooper Hannon enlisted the help of Trooper Workman after informing him of his investigation regarding the CI.  Hannon Test. 23:2-11 (confirming he had already informed Troopers Workman or Fields "about the CI tips" prior to when they initiated the traffic stop).  Trooper Hannon testified that "based on the information that [he] had alone," he had "reasonable suspicion that [defendant] was committing a crime," that would justify the initiation of a traffic stop, even if defendant had not violated

any traffic laws.  Id. at 24:24-25:3.  Rather, Trooper Hannon

set up traffic surveillance with Troopers Workman and Fields

because he "just thought that would be the best investigative

route to do."  Id.  Nonetheless, Trooper Hannon later confirmed

that defendant was pulled over based on the traffic violations

alone, not reasonable suspicion that defendant was committing a

crime.  Id. at 22:9-15.

Viewing the totality of the circumstances and

crediting the officer's determinations, the court finds that the

CI's tip provided at most reasonable suspicion that defendant

was engaged in criminal activity.

### c.   K9 Kali's Dog Sniff

Defendant's next arguments relate to K9 Kali's

reliability and whether the dog sniff itself violated the

defendant's Fourth Amendment right to be free from unreasonable

searches, either based on K9 Kali's physical contact with his

vehicle or K9 Kali's brief insertion of his snout into

defendant's vehicle at both the right rear passenger window and

the driver's window.  Prior to addressing each argument, it is

helpful again to consider the law regarding what a "search" is

within the meaning of the Fourth Amendment.

The Fourth Amendment provides that "[t]he right of the

people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This text "reflects [the Fourth Amendment's] close connection to property," and thus "Fourth Amendment jurisprudence was tied to common-law trespass." United States v. Jones 565 U.S. 400, 405 (2012). The Court in Jones, finding a warrantless attachment of a GPS tracker to a defendant's vehicle violates the Fourth Amendment's prohibition on unreasonable searches, revived a property-based approach to determining whether a "search" occurred: "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Jones, 565 U.S. at 406 n.3).

This property-based approach applies a two-part test: whether (1) the government trespassed into or onto property protected by the Fourth Amendment and (2) did so with the intent to obtain information. See id. at 10 (holding, in part, whether a "search" occurred "depends upon the purpose for which they entered" an area protected by the Fourth Amendment).

The second approach to determining whether a Fourth Amendment "search" has occurred is one that considers the reasonable expectation of privacy, as articulated in Katz v.

United States, 389 U.S. 347, 360 (1967).  Under the "reasonable
expectation of privacy" approach, a Fourth Amendment "search"
occurs upon official intrusion into a person's reasonable
expectation of privacy, which is present where "the individual
has an expectation of privacy that society is prepared to
recognize as reasonable."  Kyllo v. United States, 533 U.S. 27,
34 (2001).

     A Fourth Amendment search is reasonable when it is
supported by probable cause.  See United States v. Green, 740
F.3d 275, 281-82 (4th Cir. 2014).  Probable cause is "a
flexible, common-sense standard," which "requires only that 'the
facts available to the officer would warrant a man of reasonable
caution in the belief that certain items may be contraband ...
or useful as evidence of a crime; it does not demand any showing
that such a belief be correct or more likely true than false.'"
Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality
opinion)).  Probable cause to conduct a search based upon a
drug-detection dog's alert exists when the totality of the
circumstances, "viewed through the lens of common sense, would
make a reasonably prudent person think that a search would
reveal contraband or evidence of a crime."  Florida v. Harris,
568 U.S. 237, 248 (2013); see Green, 740 F.3d at 281-82.  This
standard is met when the totality of the circumstances indicate

34

the alert is reliable.  See Harris, 568 U.S. at 246-47.

"[E]vidence of a dog's satisfactory performance in a

certification or training program can itself provide sufficient

reason to trust his alert."  Id.

### i. Canine Reliability

Defendant "challenges [K9 Kali]'s reliability,

certification, and training as a drug detection dog," and

contends that his alert failed to provide probable cause to

believe the defendant's vehicle had contraband.[11]  Def. Mot. Br.

5.  The government provides ample evidence that K9 Kali had been

trained and has proved to be reliable.  Trooper Workman

testified to the fact that he and K9 Kali had completed a month-

long K9 handler course at the West Virginia State Police Academy

"specific to narcotic work," and that K9 Kali is trained in the

apprehension, tracking, and the identification of

methamphetamine, marijuana, cocaine, crack cocaine, and heroin.

Workman Test., 33:16-34:8, 35:19-36:6; see Workman and K9 Kali

Training Log 2020, Suppression Hearing Govt. Ex. 4, ECF No. 48-3

(hereinafter, "K9 Kali 2020 Training Log").  At the time of the

───────────────────

[11] This argument is briefly stated only in the defendant's first brief on this
motion.  Though later briefing discusses the dog's training in the context of
whether the government can be held responsible for the dog's actions during
the sniff, the defendant does not focus on the dog's reliability,
certification, or training after his one-sentence contention in his first
brief.  Def. Mot. Br. 5.  Nonetheless, the court undertakes a reliability
analysis.

stop, Trooper Workman and K9 Kali had received two training certificates from West Virginia State Police Canine Operations Unit, which were obtained following satisfactory performances in the tests administered by it to ensure continued competency. Id. at 36:23-39:13, 42:5-43:19; see Suppression Hearing Govt. Ex. 2, at 6 (certificate issued January 19, 2023). The pair engaged in continuous, ad hoc "daily" training thereafter, and they were certified again sometime after the traffic stop in this case. Id.; id. at 69:22-70:22 (confirming monthly training with the K-9 unit during cross examination). K9 Kali has conducted "dozens" of field drug-detecting sniffs and has accurately given a positive "alert" "approximately" 20 or 30 times. Id. at 44:14-23. During cross examination, Trooper Workman testified to an injury K9 Kali had previously sustained but adamantly maintained that it had no impact on his drug-detecting abilities, and defendant has not argued otherwise. Id. 72:3-73:11.

In the videos of the drug sniff in this matter, there is no indication (nor argument from defendant) that any officer interfered in the course of K9 Kali's drug sniff. The court finds that an alert from K9 Kali during a permissible dog sniff is reliable and would be sufficient to establish probable cause to search for a narcotic that K9 Kali is trained to identify.

ii.  Search by Canine's Trespass by Contact

Defendant further argues that K9 Kali's drug sniff of defendant's car was a warrantless "search," unsupported by probable cause and thus impermissible under the Fourth Amendment.

As a general rule, "a dog sniff is not a search within the meaning of the Fourth Amendment."  Branch, 537 F.3d at 335-36.  Under the Katz "reasonable expectation of privacy" approach to determining whether a search has occurred, "[a]ny intrusion on [a defendant's] privacy expectations" during a "dog sniff . . performed on the exterior of [a] car while [the defendant] was lawfully seized for a traffic violation" typically "does not rise to the level of a constitutionally cognizable infringement."  Illinois v. Caballes, 543 U.S. 405, 409 (2005).  Defendant does not contend that the dog sniff in this case infringed upon his reasonable expectation of privacy.

However, Jones recognized that the Fourth Amendment's protections against unreasonable searches extend also to an individual's property such that when "[t]he Government physically occupie[s] private property for the purpose of obtaining information," the intrusion constitutes a "search" within the meaning of the Fourth Amendment.  Jones, 565 U.S. at

404-05.  Defendant argues that K9 Kali's sniff was an unreasonable "search" under Jones's property-based approach.

This analysis is complicated by the fact that the state action challenged — K9 Kali's sniff, including when he placed his front paws on two of the open window frames of defendant's car and put his snout into the vehicle for approximately two seconds at the rear passenger side window and four seconds at the driver window — was done by a canine, rather than an officer.  See Workman Bodycam, at 16:14:15-17 (rear passenger window sniff); 16:14:23-32 (driver's side window sniff), ECF No. 21-1.  Though it is settled law that a "dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing" and must accord with the Fourth Amendment's prohibition on unreasonable searches, Rodriguez, 575 U.S. at 355, the government argues that it cannot be held accountable — and thus no violation of the Fourth Amendment can be found — where a trained canine's instinctive behavior, absent police misconduct, instruction, or influence, causes what would otherwise be an unreasonable search.  Govt. Resp. Br. 16-19, ECF No. 27; Govt. Suppl. Resp. 2-9.

Under Jones, the court must ascertain whether a Fourth Amendment "search" occurred during K9 Kali's two intrusive sniffs of defendant's vehicle by determining, first, whether K9

38

Kali trespassed against defendant's constitutionally-protected property and whether such trespass was done for "the purpose of obtaining information."  If so, the court must then consider whether K9 Kali's actions are attributable to the state, and thus a violation of the Fourth Amendment's prohibition of unreasonable searches.

### iii.   Trespass

The first question is whether K9 Kali trespassed against a property interest protected by the Fourth Amendment – that is, defendant's "person[], houses, papers, [or] effects." U.S. Const. Amend. IV; see Jones, 565 U.S. at 404-405.  As a threshold matter, "[i]t is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." Jones, 565 U.S. at 404.

The question, in turn, is whether K9 Kali's placement of his paws on defendant's vehicle's window and intrusion of his snout into defendant's open windows (first, at the rear passenger side, then, at the front driver side) constitute trespass.  Jones and its progeny instruct that this inquiry is broad, requiring courts to understand that "the property of every man [is] so sacred, that no man can set his foot upon his neighbor's close without his leave; if he does he is a trespasser," and so, any "physical[] occup[ation] [of] private

property" constitutes trespass.  Id. at 404-05 (citing Brower v. County of Inyo, 489 U.S. 593, 596 (1989) (quoting Entick v. Carrington, 95 Eng. Rep. 807 (C.P. 1765))).  In Florida v. Jardines, the Court held that when officers and their canine stood "firmly planted" on the defendant's "constitutionally protected area" – there, the curtilage of his home – without license, the officers committed trespass and thereby implicated the Fourth Amendment.  569 U.S. at 7-8.

As Jardines recognized, "the home is first among equals" and the curtilage is tantamount to the home itself for Fourth Amendment purposes.  Id. at 569 U.S. at 6.  Nonetheless, the Court found dispositive any "intrusion" or "occupation" of a constitutionally protected area, not only a home or curtilage. Id.  In support of its conclusion in Jones, the Court cited to its decision in New York v. Class, 475 U.S. 106 (1986), where it found that even under the "reasonable expectation of privacy" approach, to examine the outside of a car is not a search, but "an officer's momentary reaching into the interior of a vehicle did constitute a search."  Jones, 565 U.S. at 400.  Indeed, the "Court expressly rejected the notion that the exterior of a car is entitled to less protection under [the property-based] theory: '[b]y attaching the [GPS] device to the Jeep, officers

encroached on a protected area.'" United States v. Dixon, 984
F.3d 814 (9th Cir. 2020) (citing Jones, 565 U.S. at 410).

     The Supreme Court has not explicitly defined
"trespass," "intrusion," or "occupation" in this context.  See
Taylor v. City of Saginaw, 922 F.3d 328, 333 (6th Cir. 2019).
Nor has the Fourth Circuit.  Accordingly, the court takes
guidance from the reliance of Jones, Jardines, and circuit court
cases on the common law of trespass and notes that, as defined
by the Restatement, common-law trespass is "an act which brings
[about] intended physical contact with a chattel in the
possession of another."  Restatement (Second) of Torts § 217
cmt. e (1965); see Taylor, 922 F.3d at 332-333; Jones, 565 U.S.
at 404-05 (relying upon Entick v. Carrington, 95 Eng. Rep. 807
(C.P. 1765)); Jardines, 569 U.S. at 8 (relying upon the "strict
rule of the English common law"); United States v. Dixon 984
F.3d 814, 820-21 (9th Cir. 2020) (relying upon Taylor to find
that police insertion of a key into the lock of a car to
determine if car belongs to suspect is a trespass to obtain
information).

     Defendant argues that K9 Kali trespassed onto his
vehicle in four instances: when K9 Kali placed two paws on the
open windowsill of the rear passenger window, when K9 Kali
nearly instantaneously thereafter put his snout into the open

rear passenger-side window, and when K9 Kali did the same at the front driver-side window.  As a threshold matter, defendant gave no license or permission for the officers to search his car. Rather, he declined requested consent.

Applying the Restatement definition, the court finds that both instances of K9 Kali simultaneously planting his front paws on the defendant's vehicle's open windowsill and penetrating into the car qualify as a trespass into defendant's car, an "effect" for the purposes of the Fourth Amendment.  Such an act is at least as intrusive as an officer tapping a tire to see if there were more than just air inside, United States v. Richmond, 915 F.3d 352, 357-59 (5th Cir. 2019), or chalking a car tire, Taylor, 922 F.3d at 332-33.  See also State v. Dorff, 171 Idaho 818, 999 (Idaho 2023) (finding a Jones trespass where a drug dog "jumped up onto the door[] and planted his two front paws on the door (and then the window) as he sniffed the upper seams of the vehicle").  As the Court in Class articulated and the Court in Jones reaffirmed under the property-based approach, "an officer's momentary reaching into the interior of a vehicle" constitutes a search.  Jones, 565 U.S. at 410 (citing Class, 475 U.S. at 114-15).

The government argues that neither the placement of K9 Kali's paws on the defendant's vehicle nor the insertion of his

snout into the open windows qualify as a trespass because, it
asserts, "[b]rief physical contact with the exterior of a
vehicle, without more, is not analogous to either [Jones or
Jardines] and does not qualify as an 'intrusion' upon or an
'occupation' of the vehicle."  Govt. Suppl. Resp. at 3, ECF No.
44 (citing United States v. Anderson, 658 F. Supp. 3d 1000, 1014
(D. Kan. 2023) ("It is not clear that the 'dignitary interest'
in possession of a car on a public street is violated by the
inconsequential touch of a dog . . . ."); United States v.
Macias, No. 18-CR-137, 2018 WL 6600271, at *2 (E.D. Wis. Dec.
17, 2018) (rejecting defendant's argument that officer
"trespassed on [defendant's] vehicle when he cupped his hands,
making contact with the window while peering inside, and then .
. . attempted to open the door" and distinguishing Jones because
"the officers in that case did more than merely touch the
vehicle while conducting a visual inspection"); United States v.
Owens, No. 2:15-cr-55-NT, 2015 WL 6445320, at *9 (D. Me. Oct.
23, 2015) ("It is a stretch to describe . . . momentary contact
with the outside of an inanimate object as an 'intrusion' upon
the [d]efendant's effect.").

     The court is unpersuaded.  In Anderson, the
"inconsequential touch" in question occurred when the canine
"raised up once or twice without touching the car, and then

momentarily touched his paws on the driver's door as he raised up again" and immediately lowered himself.  Anderson 658 F. Supp. 3d at 1007.  In contrast, K9 Kali's trespass was more severe — K9 Kali planted himself at defendant's open window and simultaneously penetrated into defendant's vehicle for approximately two seconds at the rear window and four seconds at the driver's window.  See Workman Bodycam, at 16:14:15-17 (rear passenger window sniff); 16:14:23-32 (driver's side window sniff), ECF No. 21-1.  The district court decisions in Macias and Owens simply conclude that an officer's "mere" or "momentary" touch, without more, was insufficient there to establish trespass.  Macias, 2018 WL at *2; Owens, 2015 WL at *9.  Here, K9 Kali engaged in significantly more than a mere or momentary touch and actually inserted his snout into the defendant's car.

Consequently, the court finds that trespass occurred when K9 Kali placed his paws on the defendant's vehicle's windowsill and inserted his snout through the open windows, both at the rear passenger side window and driver's window.

iv.  For the Purpose of Obtaining Information

The next step of the Jones inquiry is whether the trespasses occurred "for the purpose of obtaining information."

_Jones_, 565 U.S. at 404.  Without that purpose, a mere trespass is insufficient to qualify as a Fourth Amendment search.  _Id._

A trained narcotic-detecting "dog sniff . . . is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'"  _Rodriguez_, 575 U.S. at 355 (quoting _Indianapolis v. Edmond_, 531 U.S. 32, 40–41 (2000)); _see_ _United States v. Perez_, 30 F.4th 369, 375 (4th Cir. 2022) ("[A] [dog] sniff is intended to detect ordinary criminal wrongdoing.") (internal citations omitted).

The government argues that the dog sniff did not occur for the purpose of gathering information because K9 Kali's contact with the exterior of defendant's vehicle did not itself convey information to Trooper Workman.  Govt. Suppl. Resp. 4, ECF No. 44.  Not only does this argument fail to address K9 Kali's penetration into the car, but it is also an ex post facto argument that defines the purpose of an act with its result.  The government relies on a district court case where the court held that under _Jones_, when no "information [is] gained directly through the trespass," there has been no search.  Anderson, 658 F. Supp. 3d at 1014.  This argument is unavailing: _Jones_ and _Rodriguez_ are clear that the court's focus must be on the

45

"purpose" motivating the act, not the act's result.[12]  Jones, 565 U.S. at 404; Rodriguez, 575 U.S. at 354.  The court finds that, because a dog sniff is, by its nature, done for the purpose of gathering information, K9 Kali's trespasses were done for that purpose.

       v.  Attribution of K9 Kali's Actions to the Government

      Still, K9 Kali's trespassory actions are not Fourth Amendment "searches" unless such actions are attributable to the government.

      Though neither the Supreme Court nor the Fourth Circuit has identified the outer bounds of when a drug dog's behavior is state action, circuit courts of appeals have articulated guiding principles to determine when a trained canine's sniff — during an otherwise constitutional sniff — violates the Fourth amendment.  See United States v. Sharp, 689 F.3d 616, 620 (6th Cir. 2012); United States v. Pierce, 622 F.3d 209, 214 (3d Cir. 2010); United States v. Vazquez, 555 F.3d 923, 930 (10th Cir. 2009); United States v. Lyons, 486 F.3d 367 (8th Cir. 2007); United States v. Olivera-Mendez, 484 F.3d 505, 511-12 (8th Cir. 2007); United States v. Stone, 866 F.2d 359, 364

---

[12] Certainly, impermissible searches that do not lead to inculpating evidence would far less often reach the stage of litigation where a court must rule on its suppression — there would be nothing to suppress.

(10th Cir. 1989).  In each of these cases, the court has looked to whether the dog's actions were "instinctual rather than orchestrated," Sharp, 689 F.3d at 620, and whether the officers created the opening for the dog to enter the vehicle.  As the Tenth Circuit put it in Vazquez, a dog sniff of the interior of a car during a lawful detention does not violate the Fourth Amendment when "(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog."  555 F.3d at 930; Sharp, 689 F.3d at 620 ("We now join our sister circuits in holding that a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump.").

As defendant points out, these cases were decided prior to Jones and Jardines, which awakened the "dormant" "[r]eliance on principles of property law, such as trespass," in Fourth Amendment jurisprudence.  United States v. Wilford, 961 F. Supp. 2d 740, 764 (D. Md. 2013).  Though the court sees no reason to disturb the general logic of the Vazquez/Sharp approach, it must be updated to accord with Jones' instruction that a search occurs upon trespass with the intent to obtain

information.  See, e.g., United States v. Ponce, 734 F.3d 1225,
1227-28 (10th Cir. 2013) ("We think that the Supreme Court's
recent decision in Jardines . . . may call into question the
application of some of our precedent that touches on this
issue.").

A dog sniff in which the dog trespasses onto
defendant's property does not violate the Fourth Amendment when
the dog's trespassory actions were instinctual, and not due to
encouragement or orchestration by its handler or by officers,
including, for example, opening a point of entry used by the
dog.  See Vazquez, 555 F.3d at 930; Pierce, 622 F.3d at 214.  In
this context, "instinctual" means the dog acted "without
assistance, facilitation, or other intentional action by its
handler."  Pierce, 622 F.3d at 214.

The court has already found that K9 Kali trespassed
upon defendant's vehicle at both the rear passenger and driver's
windows by simultaneously "upping" onto the windowsill and
penetrating into the vehicle.  The court now finds that the
trespasses at each window were not alone instinctual; rather,
they were the result of deliberate, repeated, and intentional
training to "up" onto vehicles while searching for narcotics,
enabling simultaneous penetration into open windows when, as in
this case, the canine is not restrained.  See Workman Test.

48

73:19-74:1 (discussing training to "up").  Such behavior, which occurred at each of the two windows approached, is in direct contravention of <u>Jardines</u>' prohibition of trespasses to obtain information with drug dogs.

While testifying at the suppression hearing, Trooper Workman, K9 Kali's handler, testified that "upping" — K9 Kali placing his paws on a car — "[is] not something common or . . . uncommon.  We could be running something like a box truck, a little higher off the ground, and you may want to detail him in an upward motion to get those seams up higher," indicating that K9 Kali is particularly trained to be "detail[ed] in an upward motion" to get off the ground and higher on a vehicle.[13]  <u>Id.</u>  Indeed, Trooper Workman confirmed that he and Kali "[have] done enough training now that he kind of [ups onto a car] instinctively.  It's not something that [Workman] even [has] to prompt at this point, unless [Workman] want[s] to."  <u>Id.</u> at 74:11-18.  Trooper Workman says K9 Kali "ups" "approximately" once per stop.  <u>Id.</u>  In this instance, K9 Kali "upped" at each of the two doors he inspected, and Trooper

_____

[13] The government argues that "repeated detailing is not the same as Trooper Workman specifically training K9 Kali to jump onto a vehicle."  Govt. Suppl. Resp. 6 n.6.  Not only is this unsupported, but repeated training to respond to a particular detail by upping and then permitting and rewarding the dog when he ups without that detail <u>is</u> training inasmuch as it behaviorally conditions the dog.

Workman made clear that during a search, he has "no issue" letting Kali "search the way he searches" because he does not want to "interfere with a sweep," even when K9 Kali unnecessarily and without probable cause trespasses into another's property.  Id. at 74.

As the government notes, and Workman's testimony and body camera footage, ECF No. 21-1, confirm, Workman did not explicitly instruct K9 Kali to "up" onto defendant's car or penetrate its windows during the dog sniff.  Id. at 74:3.  After K9 Kali was mounted on the car at the lowered rear passenger window and had his head inside the vehicle, Trooper Workman "attempted to pull him down and pull him away from it, just to continue to sweep."  Id. at 84:20-22.  Nonetheless, after rounding the front of the vehicle, when Trooper Workman and K9 Kali got to the driver-side front window, which was down, K9 Kali again jumped to put his paws on the windowsill and put his head into the car.  Jt. Stip. at ¶ 8.

As to the open windows, the court finds that neither window was open due to Trooper Workman's actions.  The driver side front window was down by the time Trooper Workman first arrived at defendant's car.  See ECF No 21-1 (Workman's Bodycam) at 16:09:00-34.  During conversation with defendant, Trooper Workman asked him if there was anybody in the backseat, and

defendant responded by lowering his rear windows.  Id.  Trooper Workman then told defendant that he could raise them immediately thereafter, which defendant opted not to do.  Id. at 16:10:28.

In none of the cases that address whether a dog's otherwise-impermissible actions constitute a Fourth Amendment search do the courts delve into whether the dog had been particularly trained to engage in the violative activity.  See See Sharp, 689 F.3d at 620; Pierce, 622 F.3d at 214; Vazquez, 555 F.3d at 930; Lyons, 486 F.3d at 370; Olivera-Mendez, 484 F.3d at 511-12; Stone, 866 F.2d at 364.  Nevertheless, responsibility for ensuring the dog's actions comply with the law falls to its handler, and the "Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken." Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 392 (1995).

The Fourth Circuit has similarly found that when a police canine behaves as trained, an officer cannot avoid responsibility when the dog "behaved exactly as it was trained to do." Melgar ex rel. Melgar v. Greene, 593 F.3d 348 (4th Cir. 2010).  In Melgar, an officer, seeking to find a missing child, decided to use his patrol dog which had been "trained to find individuals and to bite them when he came in contact." Id. at 352.  When the dog indeed found the missing child and bit him,

the court had to pass upon the plaintiff's 42 U.S.C § 1983 claim that the officer thereby "seized" the child in violation of the child's Fourth Amendment right to be free from unreasonable seizure.  Id. at 353.  Finding that the dog bite qualifies as a seizure, the court held that the officer "use[d] a dog conditioned to bite its target when found and thus cannot claim that there was no seizure when the dog he set in motion behaved exactly as it was trained to do."  Id. at 354.

Here, the court finds that K9 Kali's "upping" onto the car, both at the rear passenger-side window and the front driver-side window, occurred not because of instinct alone, but because K9 Kali had been particularly trained to "up" onto cars while executing a dog sniff.  K9 Kali was only in position to put his head into the open windows, which Trooper Workman knew were open prior to the search by K9 Kali, because of the "upping."  Together, K9 Kali's "upping" and penetration into defendant's vehicle at both the rear passenger and driver's windows — a trespass at each location — was done for the purpose of determining whether contraband was present in the car — as a result of orchestrated training by her handler in violation of the Fourth Amendment under Jones and Jardines.  The government cannot claim that there was no search when it uses a dog trained to jump onto a vehicle, contravening the owner's property

interest and creating the opportunity to penetrate therein which the dog is allowed to do, and the dog does exactly that.

Because K9 Kali trespassed onto defendant's property with the officer's intent to obtain information by his "upping" onto defendant's car, as he had been trained to do, and simultaneously penetrating through the open windows, the court finds that an unlawful search under the Fourth Amendment thereby occurred.  The alert that followed resulted in an equally unlawful search of the car that revealed the contraband drugs.

     d.    Justification to Search Prior to Dog Sniff

The government argues in its supplemental response that Trooper Workman had probable cause to search defendant's vehicle before K9 Kali trespassed onto it.  <u>See</u> Govt. Suppl. Resp. 9, ECF No. 44.

"The automobile exception [to the Fourth Amendment's warrant requirement] allows police to conduct a warrantless search of a readily mobile vehicle if they have probable cause to do so."  <u>United States v. Caldwell</u>, 7 F.4th 191, 200 (4th Cir. 2021).  "Probable cause 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  <u>Id.</u> (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996)).  The government thus argues that probable

cause to search defendant's vehicle arose — prior to K9 Kali
simultaneously "upping" onto defendant's vehicle and penetrating
the same — due to "K9 Kali's immediate detection of the odor of
drugs upon beginning the sniff of [d]efendant's vehicle,
combined with the information Trooper Workman had learned from
Trooper Hannon before the traffic stop."  Govt. Suppl. Resp. Br.
9, ECF No. 44.

     In support of this argument, the government notes
that, though K9 Kali's alert to signal that he detected the odor
of controlled substances was to sit, Trooper Workman testified
that he "can tell when [K9 Kali] comes into the odor of
narcotics . . . before he goes into that seated position"
because K9 Kali's behavior changes, including a "head jerk
toward" the source of an odor of narcotics, "breathing, tense in
his body, just basic mannerisms, in general . . . when he comes
into the odor of narcotics."  Workman Test. 43:15-22.  Trooper
Workman further testified that K9 Kali "always alert[s]" after
exhibiting "a mix" or "some of" those changes are exhibited.
Id. at 44:6-13.

     First, the court notes that, as discussed above, the
CI's information was sufficient only to establish reasonable
suspicion the defendant was engaged in criminal activity, not
probable cause.  Though the lack of probable cause from the CI

alone is not dispositive because the court must examine the totality of the circumstances, the lack of probable cause from the CI requires that further indicia of culpability must be present in order to find that probable cause exists to justify a warrantless search.

The government's argument is further belied by the fact that Trooper Workman also testified that he did not notice any of the above "body change[s]" until K9 Kali had already "upped" onto defendant's vehicle and put his head into the rear window. Id. at 60:2-10 ("[K9 Kali] initially upped near the rear passenger side seat, which I observed somewhat of a body change, like somewhat of a breathing change around there, a small one. I kind of pulled him out of it and worked him around, and he really locked in. And he displayed that real quick breathing change at the driver's side door. And that's when he really locked in. I couldn't even pull him out of the odor at that point. He was locked in firm. And then he went into that sit."). Even if probable cause to search defendant's vehicle could arise simply upon K9 Kali's body changes, which the court does not herein decide, Trooper Workman only noticed those body changes after K9 Kali had already trespassed onto defendant's constitutionally protected property.

Additionally, Trooper Workman testified that K9 Kali always alerted after displaying "a mix of" or "some of" the bodily changes described above. Id. at 44:6-13. Here, however, K9 Kali only displayed a singular "body change," consisting of "somewhat of a breathing change" upon upping and penetrating into the rear passenger window; that is, "a small one." Id. at 60:2-5; 92:20. This is short of the multiple or mix of changes that Trooper Workman testified are indicative of an oncoming alert and thus insufficient to establish probable cause. Only after K9 Kali upped and penetrated into the driver's side window, as well, did Trooper Workman observe an additional body change: K9 Kali exhibited a "real quick breathing change" and his body "locked in firm" to the extent that Trooper Workman "couldn't even pull him out of the odor." Id. at 60:6-10. The court declines to find that Trooper Workman could reasonably know that K9 Kali "[came] into the odor of narcotics" at the rear passenger window based only on a "small," "somewhat of a breathing change," particularly inasmuch as such a finding would be contrary to his earlier stated reliance on multiple or mixed changes for such an indication. Workman Test. 60:4, 95:9-96:23; see id. at 44:6-13.

Finally, the government's argument is further undermined by the fact that, at the time of the stop and at the

suppression hearing, Trooper Workman did not believe that he had probable cause to justify a search of defendant's vehicle without a positive alert from K9 Kali. Id. at 61:22-25 ("If the dog wouldn't have indicated after three passes, I would have consulted Trooper Hannon and let him know, and then issued some kind of citation, possibly a warning, to the (sic) Mr. Corbett.").

Accordingly, the court finds unproven the government's contention that K9 Kali's reaction at the rear passenger door provided probable cause prior to the point when K9 Kali trespassed into defendant's vehicle.

e.    Reasonable Suspicion Justifying Search

The government additionally argues that, if K9 Kali's actions were deemed to be a "search" subject to the Fourth Amendment, that search was reasonable. Govt. Suppl. Resp. Br. 12-14, ECF No. 44. The government analogizes the dog sniff in this matter, during which K9 Kali planted his paws on the defendant's windowsills and breached the interior of defendant's car with his snout, to a Terry frisk. The government argues, in essence, only reasonable suspicion that contraband is in the vehicle is necessary to justify the dog sniff due to the governmental interest in officer safety and drug interdiction.

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." Riley v. California, 573 U.S. 373, 381 (2014) (internal quotation marks omitted).  Though a warrantless search is generally per se unreasonable, id. at 382, under certain circumstances, reasonable suspicion of criminal activity, a "lesser" standard than probable cause "satisfies the Constitution." United States v. Knights, 534 U.S. 112, 121 (2001).  This is so, for example, when the totality of the circumstances indicate safety or destruction of evidence concerns such as when an officer "has reasonable suspicion that an individual . . . might access the vehicle to gain immediate control of weapons." Arizona v. Gant, 556 U.S. 332, 346-47 (2009).

In United States v. Terry, 392 U.S. 1 (1968), the Court held that where an officer can point to "specific and articulable facts," objectively viewed in the totality of the circumstances, that give rise to reasonable suspicion of criminal activity, a "severe, though brief, intrusion upon cherished personal security" is justified by countervailing governmental interests in "effective crime prevention and detection" and officer safety.  392 U.S. at 22-25.  There, the court held that the totality of the circumstances objectively supported a reasonable suspicion of criminal activity, and a

brief, warrantless frisk of the defendant was justified by the "more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." <u>Id.</u> at 23.

<u>Terry</u>'s logic and its interest in officer safety extends to traffic stops. <u>Michigan v. Long</u>, 463 U.S. 1032, 1048 (1983). During a <u>Terry</u> stop of an automobile,

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

<u>United States v. Griffin</u>, 589 F.3d 148, 153 (2009) (quoting <u>Long</u>, 463 U.S. at 1048). Such limited searches are permissible even "when the suspect is outside of the vehicle and under an officer's 'brief control.'" <u>United States v. Holmes</u>, 476 F.3d 270, 276 (2004) (quoting <u>Long</u>, 463 U.S. at 1051–52).

The traffic stop here was spawned by probable cause that the defendant had committed traffic violations; it was not based upon reasonable suspicion that defendant was presently engaged in criminal activity. Hannon Test. 22:9-14 ("[T]o

conduct a traffic stop, you have to have reasonable suspicion they're committing a crime. In this case, he was traveling above the posted speed limit and his window tint was illegal.  So he was pulled over for that, at which time, the troopers conducted the rest of their investigation, how they would with the traffic stop."); 24:24-25:3 ("I believe that [we had] reasonable suspicion that he was committing a crime; therefore, a traffic stop could be conducted. But I just try to do it as right as I know anyway, and I just thought that [a traffic stop based on probable cause of a traffic violation] would be the best investigative route to do.").

Though Trooper Workman testified that "I felt that, at that time, I had enough reasonable suspicion based on [] Trooper Hannon's investigation" and that he "would have stopped the car, regardless, based on" that suspicion, the fact remains that the prompt of the traffic stop in question was "independent PC [probable cause]" of an illegal window tint and speed.  Workman Test. 87:16-21.  Indeed, while testifying to the grand jury to obtain the indictment in this case, though Trooper Hannon informed them of the information the CI provided to him, he told the grand jury that the only reasons for the traffic stop were the two observed traffic violations.  See Hannon Test. 19:3-19. The basis of the stop was to issue a traffic citation for the

illegal window tint and speed, not drug interdiction.  See id.
at 61:22-25 ("If the dog wouldn't have indicated after three
passes, I would have consulted Trooper Hannon and let him know,
and then issued some kind of citation, possibly a warning, to
the Mr. Corbett.").

        The court has already determined that the information
provided by the CI established, at most, reasonable suspicion
that the defendant was engaged in drug-related criminal
activity.  That reasonable suspicion may be an alternate
justification for the traffic stop itself.  See United States v.
Singh, 363 F.3d 347, 355 (4th Cir. 2004).  However, reasonable
suspicion of drug-related criminal activity alone is
insufficient to warrant search of the defendant's vehicle.
Under the relevant exceptions to the warrant requirement, the
officers could fully search the defendant's vehicle with
probable cause or search within the passenger compartment for
weapons upon reasonable suspicion that the defendant is armed
and dangerous.  See Caldwell, 7 F.4th at 200 (automobile
exception); Long, 463 U.S. 1048 (permitting a Terry frisk of a
passenger compartment).  Neither is satisfied here.  The
officers did not have probable cause to search, nor did they
have reasonable suspicion that the passengers were armed and

dangerous.  Mere reasonable suspicion of criminal activity does not justify a search of constitutionally protected property.

In the course of the stop, the officers were justified in removing defendant and his passenger from the vehicle and briefly patting them down for their safety.  <u>See</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977); Workman Test. 89:14-90:1 ("I knew that I was going to ask for consent [to search defendant's car].  So the biggest [reason to ask defendant to exit the vehicle] would be officer safety concerns.  There was a knife on the dash. . . . [i]t is a threat, but I wasn't super concerned with its location.").  Having addressed their safety concerns by removing all occupants of the car and being without consent or probable cause to conduct a warrantless search, the officers were not permitted to search the defendant's vehicle.  This, they understood at the time and at the suppression hearing.  <u>Id.</u>

The court has found that K9 Kali's behavior constitutes a "search" under the Fourth Amendment, consistent with <u>Jardines</u>' instruction that the use of a trained canine in an impermissible location runs afoul of the Amendment's prohibition of unreasonable searches.  K9 Kali's behavior was more than a frisk – he mounted the car for several seconds and put his snout inside the vehicle at each window.  This is more

than a mere pat-down, as in <u>Terry</u>, and was not done for officer safety, as the officers did not have reasonable suspicion the defendant or his passenger were armed or dangerous.  <u>See</u> <u>Terry</u>, 392 U.S. at 23.  Even if the CI's information provided sufficient reasonable suspicion that defendant was engaged in criminal activity to pull defendant over, such reasonable suspicion is not tantamount to probable cause to search the vehicle.  <u>See</u> <u>Branch</u>, 537 F.3d at 336.

The court concludes that reasonable suspicion to the extent it exists in this case is insufficient to justify K9 Kali's search of defendant's vehicle.

### f.   Exclusionary Rule

Having established that K9 Kali's sniff of defendant's car is an unreasonable "search" under the Fourth Amendment, the question of remedy must still be answered.  To enforce the Fourth Amendment, the Supreme Court has established the exclusionary rule, which "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." <u>Davis v. United States</u>, 564 U.S. 229, 231-32 (2011). Accordingly, when such a violation is found, the "exclusionary rule is frequently employed."  <u>United States v. Taylor</u>, 963 F. Supp. 2d 595, 600-01 (S.D.W. Va. 2013) (collecting cases).

There are certainly exceptions to the exclusionary rule, as "'[s]uppression is not a personal constitutional right,' nor seen as 'redress' for the constitutional wrong done." Id. at 601 (quoting Davis, 564 U.S. at 237).  The Court in Davis noted that "[e]xclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." Davis, 564 U.S. at 237.  The Court directed that the exclusion inquiry must focus on the "flagrancy of the police misconduct at issue." Id.  "So exclusion is considered when police practices are deliberate enough to result in 'meaningfu[l]' deterrence and 'culpable enough to be 'worth the price paid by the justice system.'" Taylor, 963 F. Supp. 2d at 601 (quoting Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. 135, 144 (2009))).  The Fourth Circuit has framed the inquiry as follows:

> In determining the deterrent effect of applying the rule, the Herring Court explained that the deterrent effect is higher where law enforcement conduct is more culpable. Thus, "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule."
>
> The Herring Court explained that the rule should not be applied where excluding the evidence would have little deterrent effect on future constitutional violations by law

> enforcement officers, and the cost to
> society of such a rule is high. Id. at 147–
> 148, 129 S.Ct. 695 (concluding that "when
> police mistakes are the result of negligence
> such as that described here, rather than
> systemic error or reckless disregard of
> constitutional requirements, any marginal
> deterrence does not 'pay its way' " and the
> exclusionary rule should not be applied).

United States v. Davis, 690 F.3d 226, 251-52 (4th Cir. 2012).

And so, courts should apply the exclusionary rule where "law

enforcement actions are patently unconstitutional . . . on the

order of brazen or reckless." Taylor, 963 F. Supp. 2d at 601

(quoting Davis, 690 F.3d at 256). "Where there is little to

suggest a pattern of constitutional wrongdoing and little

likelihood of future recurrences, the deterrent capacity of the

exclusionary rule is diminished." Id.

          In this case, the court has concluded that a drug dog,

abiding by its training, jumping onto a car and resting its paws

on its windowsill while penetrating the interior of the vehicle

with his snout offends the Fourth Amendment.  While the court

relied heavily upon Jones and Jardines to arrive at this

conclusion, the principles that undergird the court's analysis

are not new.  Indeed, the common-law trespassory test applied

here finds its roots in English law that precedes the

Constitution itself.  See Jones, 565 U.S. at 405.  In Jones, the

Court explicitly states that the property-based approach helped

the court determine in Class that "an officer's momentary reaching into the interior of a vehicle did constitute a search." Id. at 410.  In Jardines, the Court again affirmed that this principle applies to drug dogs on a person's constitutionally protected property.  569 U.S. at 7-8.  Fourth Circuit precedent makes clear that Jardines holds that a dog sniff can be a search when it occurs during a trespass.[14]  United States v. Hill, 776 F.3d 243, 250-51 (4th Cir. 2015).

Despite this guidance, the West Virginia State Police and Trooper Workman trained K9 Kali to "up" onto a vehicle and enabled him to invade its interior at an open window, without probable cause to so trespass.  That training "carries a [] darker hue of culpability than a mere nonrecurring error respecting the scope of the law.  Absent suppression, the court has little reason to conclude that the unconstitutional practice of" having drug dogs mount onto and into subject vehicles will cease.  See Taylor, 962 F. Supp. 2d at 604.

---

[14] Government argues that "binding appellate precedent" supported Trooper Workman's search of defendant's vehicle with K9 Kali.  Govt. Suppl. Resp. 17. The government relies on United State v. George, 971  F.2d 1113 (4th Cir. 1992), which is unavailing inasmuch as George relied only upon Katz to find a defendant had no reasonable expectation of privacy in the outside of his vehicle or visible inside, an analysis which is inapposite here.  971 F.2d at 1120.

Thus, despite the doubtless heavy toll on the judicial system and society that suppression exacts, there is a "strong deterrent effect in suppressing the fruit of the search." Id. at 605.

### g.   Evidence to be Excluded

Because the officers would not have searched defendant's car but for K9 Kali's unreasonable search, the evidence obtained therefrom must be suppressed.  This evidence includes evidence from the "camouflage bag" Trooper Workman found while searching defendant's trunk; the "small plastic baggies of suspected controlled substances in an unlocked zipped compartment on top of the bag," as well as the substances therein; the "marijuana and a set of scales" found by Trooper Fields "in a pink bag in the trunk of the vehicle";[15] the contents of the "purse belonging to [d]efendant's passenger"; and the "locked main compartment of the camouflage bag" wherein Trooper Workman saw "suspected controlled substances," as well as the suspected controlled substances therein.  Jt. Stip. ¶ 11.

---

[15] The joint stipulation notes that, during the officers' search, "Trooper Workman leaned inside the front passenger's side door of [d]efendant's vehicle and picked up some cash that Trooper Fields had placed on the seat." Id. ¶ 12.  It is not clear where that cash came from — if it was found as a result of the officers' search, it must be suppressed; if it was in plain view prior to the search, it need not be suppressed.  In either case, the court does not adjudicate herein the ownership of the cash.

IV.   Conclusion

For the foregoing reasons, the court ORDERS that defendant's Motion to Suppress Evidence be, and hereby is, GRANTED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: February 26, 2024


John T. Copenhaver, Jr.
Senior United States District Judge